UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| IN RE MCSi, INC., SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) | Case No. 3:03-cv-015 (Hon. Walter Herbert Rice) AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT JURY TRIAL DEMANDED |

AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

Page Number

NATURE OF THE ACTION .................................................. 1

JURISDICTION AND VENUE ............................................... 5

PARTIES .................................................................. 5

PLAINTIFFS' CLASS ACTION ALLEGATIONS ................................ 8

CONFIDENTIAL WITNESSES .............................................. 10

SUBSTANTIVE ALLEGATIONS ............................................. 15

    A.    MCSi's Cash Flow Crisis ........................................... 15

        1.    MCSi's Suppliers Placed the Company on "Credit Hold" ........... 15

            a.    Examples of Suppliers Imposing Credit Holds on MCSi ..................................................... 16

            b.    Supplier-Imposed Credit Holds Caused MCSi to Lose Customers and also Threatened Existing Relationships ..................................................... 18

            c.    MCSi Misrepresented its Cash Flows to Suppliers ........... 20

            d.    Stanley and Peppel Knew of the Supplier-Imposed Credit Holds ..................................................... 20

        2.    MCSi's Desperate Attempts to Raise Cash ....................... 21

    B.    MCSi Falsely Inflated Reported Revenue ............................ 22

        1.    MCSi Prematurely Recognized Revenues in Violation of GAAP and SAB 101 ......................................... 23

            a.    MCSi Pre-Billed Maintenance/Service Contracts ............ 24

            b.    MCSi Pre-Billed A/V Contracts ........................... 25

i

          i.     University of Kentucky ........................... 29

          ii.    Northern Kentucky University ..................... 30

          iii.   Sullivan College ................................ 30

      c.   MCSi Improperly Pre-Billed Clients for Equipment
          Orders ........................................ 31

   2.   MCSi Inflated Revenues Generated from Customer
      Sales ............................................. 31

C.   MCSi Overstated Rental Income ..................................... 32

D.   MCSi Understated Operational Expenses to Falsely Inflate
     Profit Margins ..................................................... 34

E.   MCSi Created Fictitious Sales to Inflate Revenues ....................... 35

   1.   The Zengine Sham Transactions ................................ 35

   2.   The Mercatum Sham Transactions ............................. 36

F.   MCSi's Inventory Value was Materially Misstated ...................... 39

   1.   MCSi Improperly Manipulated Inventory ........................ 39

      a.   MCSi Wiped Out Inventory on the JD Edwards
          System to Justify Unsubstantiated Sales Caused
          by Pre-Billing ...................................... 40

   2.   MCSi Maintained Material Amounts of Obsolete
      Inventory ...................................... 42

      a.   Several Confidential Witnesses Observed Material
          Amounts of Obsolete Inventory ......................... 42

      b.   The ClearOne Connection .............................. 44

      c.   MCSi Failed to Record Adequate Inventory
          Reserves ........................................... 45

          3.      MCSi Auctioned Off Obsolete Inventory After the
Class Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    G.     MCSi Created Sanitized Books and Records for PwC Auditors . . . . . . . . . . . . 46

    H.     MCSi's Internal Controls Were Materially Weak . . . . . . . . . . . . . . . . . . . . . . . 47

          1.      As a Result of PwC's 2001 Audit, MCSi's Audit
Committee Knew of, and Failed to Remedy, Internal
Control Weaknesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

          2.      MCSi Failed to Properly Integrate All Its Subsidiaries
onto the JD Edwards System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
DURING THE CLASS PERIOD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

THE TRUTH IS REVEALED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

ADDITIONAL SCIENTER ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

    A.     Defendants' Actual Knowledge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

    B.     Insider Sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

          1.      Peppel Takes Steps to Protect Personal Assets . . . . . . . . . . . . . . . . . . . . 75

    C.     Profit Margin is a Key Financial Ratio Used by Covering
Analysts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

    D.     Defendants Possessed the Motive and Opportunity to Inflate
EBITDA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

          1.      EBITDA Was a Key Covenant in the Credit Facility . . . . . . . . . . . . . . . 76

          2.      EBITDA Was *the* Performance Standard on Individual
Defendants' Obligations to Repay Promissory Notes
to MCSi . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET
DOCTRINE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

STATUTORY SAFE HARBOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

COUNT I

Violation of Section 10(b) Of The Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

COUNT II

Violation of Section 20(a) Of the Exchange Act Against the Individual
Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

JURY DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

MCSi/Lender Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit A

Certification of Fuller & Thaler Asset Management, Inc. . . . . . . . . . . . . . . . . . . . . . . . Exhibit B

Certification of Paul Bykowski . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit C

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| IN RE MCSi, INC., SECURITIES LITIGATION ) ) ) ) ) ) ) ) ) | Case No. 3:03-cv-015 (Hon. Walter Herbert Rice) **AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT** **JURY TRIAL DEMANDED** |

## AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Fuller & Thaler Asset Management, Inc. ("Fuller & Thaler") and Paul Bykowski, individually and on behalf of all others similarly situated, for their Amended Consolidated Class Action Complaint, make the following allegations by and through their undersigned attorneys:

### NATURE OF THE ACTION

1.      Until it filed for Chapter 11 bankruptcy protection on June 3, 2003, and then began to liquidate its operations in February 2004, MCSi, Inc. ("MCSi" or the "Company") was a provider of integrated technical services and audio-visual ("A/V") presentation, broadcast, and computer technology products. MCSi did not manufacture any products of its own. Rather, using equipment supplied by vendors, such as Sharp, Hitachi, NEC, and SONY, MCSi assembled integrated systems, primarily audio-visual systems, for its clients. MCSi's ability to secure product from these suppliers was critical to its ability to perform its contracts with customers and generate revenues.

2.    Once considered "high-flying" and "fast growing," MCSi twice made Fortune Magazine's ranking of the 100 Fastest Growing Companies in America, in 2000 and 2001. Yet, as alleged below, the Company ultimately collapsed under the weight of its own improper accounting and other practices, resulting in: (i) the dismissal of defendant Michael E. Peppel, MCSi's class period (defined below) Chief Executive Officer, President, and Chairman, and defendant Ira H. Stanley, its class period Chief Financial Officer and Vice President; (ii) an investigation by the Securities and Exchange Commission (the "SEC"); (iii) the resignation of its outside auditor, PricewaterhouseCoopers, LLP ("PwC"); and (iv) the Company's bankruptcy and ongoing liquidation.

3.    Both before and during the class period, the Company experienced a cash flow crisis, caused in part by an aggressive campaign to acquire other companies. This cash flow crisis strangled the Company's ability to generate revenues, and created a vicious cycle. Without cash, the Company failed to timely pay suppliers for products purchased, and suppliers in turn imposed credit holds on the Company, refusing to ship product without first receiving payment. Without the product critical to its business, MCSi could not timely perform its contracts, if it could perform them at all. As a result, the Company lost many customers and contracts, severely impacting its revenue stream. In an effort to raise cash, the Company, which was already highly leveraged, held two public offerings during the class period within months of each other in 2001. These offerings did not solve the Company's cash crisis.

4.    The allegations herein show that, both before and throughout the class period, Defendants knowingly and recklessly disseminated materially false and misleading statements that were designed to give the appearance that MCSi was a profitable business operation. In

2

reality, MCSi's reported financial results were based on improper accounting practices, leading to the Company's overstatement of revenues, profit margins, goodwill, and rental and net income, and the misstatement of inventory through the manipulation of its JD Edwards computer system (the "JD Edwards System"). The JD Edwards System, MCSi's central financial system, included, inter alia, the Company's general ledger and inventory tracking and reporting functions.

5.    Specifically, Defendants engaged in a fraudulent scheme of "pre-billing" contracts and purchase orders before a job was completed or even started, thereby prematurely recognizing revenue in violation of generally accepted accounting principles ("GAAP") and SEC Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements" ("SAB 101"). In addition, the Company overstated rental income and understated operational expenses to falsely inflate profit margins. During 2002, the Company also overstated quarterly income for the first three quarters by failing to write down goodwill for impairment, in violation of GAAP.

6.    Tellingly, Defendants attempted to conceal these improper practices by creating a duplicate, sanitized set of financial books and records to provide to PwC's auditors. Further, to validate the appearance of the increased revenues achieved through improper pre-billing, Defendants artificially wiped out inventory reported in the JD Edwards System.

7.    While Defendants were engaging in these practices, and knowingly issuing false and misleading information about the Company, its financial condition, and results of operations, defendant Peppel unloaded 300,000 shares of MCSi stock at an artificially inflated price for more than $6.8 million. This illicit transaction was timed with the public dissemination of the materially false and misleading statements complained of herein.

3

8.     In February 2003, the SEC initiated an investigation of the Company, issuing a subpoena seeking the production of certain documents. In March 2003, Peppel stepped down as Chairman, and shortly afterward as President and as a director. In April 2003, defendant Stanley stepped down as CFO and Vice President. In a May 2, 2003 press release (attached as an exhibit to a Form 8-K filed on the same date), MCSi announced that "investors should not rely on MCSi's historical financial information, including the unaudited information included in MCSi's press release dated February 26, 2003 and filed on a Current Report on Form 8-K dated such date and the other 2002 quarterly and other financial information included in MCSi's reports filed with the SEC."

9.     On June 19, 2003, two weeks after the Company filed for Chapter 11 protection, PwC informed the Company's Board of Directors that it was resigning its position as the Company's external auditors. PwC's letter of resignation cited, inter alia, PwC's "inability to conclude whether MCSi has taken appropriate and timely remedial action in response to the discovery of potential illegal acts at the Company."

10.     On April 19, 2004, MCSi and the lenders participating in its Credit Agreement (National City Bank, PNC Bank, National Association, LaSalle Bank, National Association, Fifth Third Bank, The Huntington National Bank, Provident Bank, and U.S. Bank, National Association) filed a complaint in the Common Pleas Court of Montgomery County, Ohio, Civil Division, against Peppel; Stanley; Sharmilla Rao ("Rao"), Vice President of Corporate Communications; Jim Ahrns ("Ahrns"), Corporate Controller; and Scott Walther ("Walther"), Director of Financial Reporting (the "MCSi/Lender Complaint"). In the MCSi/Lender

4

Complaint, which is attached hereto as Exhibit A, the Company identifies numerous examples of the very types of misconduct alleged herein.

## JURISDICTION AND VENUE

11. The claims alleged herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated under Section 10(b) of the Exchange Act.

12. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337.

13. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). MCSi conducted business in this District, and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

14. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## PARTIES

15. As shown in the certifications attached hereto as Exhibits B and C, lead plaintiffs Fuller & Thaler and Paul Bykowski ("Plaintiffs") purchased MCSi common stock at artificially inflated prices during the class period, and have been damaged thereby.

16. Defendant Michael E. Peppel ("Peppel") was at all relevant times MCSi's Chief Executive Officer, President, and Chairman of the Board. He was also a member of the

Company's Executive Management Committee. Defendant Peppel sold $6,862,500 of MCSi stock during the class period while in possession of material, adverse, nonpublic information.

17.     Defendant Ira H. Stanley ("Stanley") was at all relevant times MCSi's Chief Financial Officer and Vice President. He was also a member of the Company's Executive Management Committee.

18.     Defendants Peppel and Stanley are collectively referred to as the "Individual Defendants."

19.     During the class period, each of the Individual Defendants made various statements regarding the Company's financial condition and results of operations in MCSi press releases, SEC filings, and other public fora.

20.     The Individual Defendants are liable as direct participants in, and as co-conspirators with respect to, the wrongs complained of herein. In addition, the Individual Defendants, as senior executive officers, are controlling persons within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. By reason of their positions of control at MCSi, the Individual Defendants were able to and did, directly or indirectly, in whole or in part, control the content of public statements issued by or on behalf of the Company. The Individual Defendants participated in and approved the issuance of such statements made throughout the class period, including the materially false and misleading statements identified herein.

21.     By reason of their positions with MCSi, the Individual Defendants had access and were privy to confidential and proprietary information concerning MCSi, its operations, finances, and financial condition, including internal Company documents, reports, and other internal

6

information provided to them. See, e.g., paragraphs 67-70, 77-78, 106-108, 114-116, 130-133, 148-149, 152-153, and 157-160, below. Through conversations and communications with other corporate officers and employees, and attendance at management and Board of Directors' meetings and committees thereof, the Individual Defendants had access and were privy to, among other things, the adverse, non-public information concerning the Company's fraudulent revenue recognition practices and other overstatements of income, its cash flow crisis, including the supplier-imposed credit hold situation, improper inventory valuation and reporting practices, and its materially weak system of internal controls.

22.     Because of their positions with the Company, the Individual Defendants controlled and/or possessed the authority to control the contents of MCSi's reports, press releases, and presentations to securities analysts and, through them, to the investing public. The Individual Defendants received copies of the Company's reports and press releases alleged herein to be misleading before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

23.     The Individual Defendants, as senior executive officers and/or directors, and as controlling persons of a publicly-traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and which was traded on the NASDAQ until it was delisted on April 25, 2003, had a duty to promptly disseminate truthful and accurate information with respect to MCSi's financial condition, results of operations, and financial statements, and to promptly correct any previously issued statements by or on behalf of the Company that had become false and misleading.

24.     Each of the Defendants knew or was reckless in not knowing that the misleading statements and omissions complained of herein would adversely affect the integrity of the market for MCSi's common stock and would cause the price of MCSi's common stock to become and/or remain artificially inflated. Each of the Defendants acted knowingly and/or recklessly in such a manner as to constitute a fraud and deceit upon Plaintiffs and the other members of the class (defined below).

25.     Defendants are liable as direct participants in, and co-conspirators with respect to, the fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of MCSi's common stock, as complained of herein, by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme (i) deceived the investing public regarding MCSi's financial condition, results of operations, financial statements, and the intrinsic value of MCSi common stock, and (ii) caused Plaintiffs and the other members of the class to purchase MCSi's common stock at artificially inflated prices.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

26.     Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who purchased MCSi securities during the period July 24, 2001 through and including February 26, 2003 (the "Class Period"), and who suffered damages thereby (the "Class"). Excluded from the Class are Defendants, senior officers and directors of the Company, members of the Individual Defendants' families and their legal representatives, heirs, successors, or assigns, and any entity in which any excluded person has or had a controlling interest, or which is a parent or subsidiary of, or is controlled by, the Company.

27.     The members of the Class are so numerous that joinder of all members is
impracticable. While the exact number of Class members is unknown to Plaintiffs at this time
and can be ascertained only through appropriate discovery, Plaintiffs believe there are hundreds,
if not thousands, of members of the Class who have purchased MCSi common stock during the
Class Period. During the Class Period, MCSi had more than 25 million shares of common stock
issued and outstanding, owned by hundreds, if not thousands, of geographically dispersed
shareholders.

28.     There is a well-defined community of interest in the questions of law and fact
involved in this case. Questions of law and fact common to the members of the Class, which
predominate over questions that may affect individual Class members, include whether:

      a.     Defendants violated the federal securities laws as alleged herein;

      b.     Defendants materially misrepresented MCSi's financial condition and
results of operations to the investing public;

      c.     Defendants omitted material facts necessary to make their statements, in
light of the circumstances under which they were made, not misleading;

      d.     Defendants knew or recklessly disregarded that their statements were
materially false and misleading;

      e.     the price of MCSi's publicly-traded stock was artificially inflated; and

      f.     Plaintiffs and the Class sustained damages and, if so, the appropriate
measure of damages.

29.     Plaintiffs' claims are typical of the claims of the members of the Class because
Plaintiffs and the Class sustained damages arising out of Defendants' wrongful conduct in
violation of federal law as complained of herein.

30.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation. Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

31.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation makes it impracticable for class members individually to redress the wrongs done them. There will be no difficulty in the management of this action as a class action. The disposition of the claims of the Class in a class action will provide substantial benefits to the parties and the Court.

## CONFIDENTIAL WITNESSES

32.     Numerous former MCSi employees have informed Plaintiffs of Defendants' improper practices, including their overstatement of revenues, net income, and earnings per share through various GAAP violations during the Class Period. These witnesses spoke to Plaintiffs' counsel on a confidential basis, and each is designated as "CW__."

33.     CW1 was an MCSi programmer from 1999 through mid-2002. CW1 provided programming for the JD Edwards System, MCSi's primary financial system. CW1's responsibilities included generating inventory reports from the JD Edwards System for inventory control managers employed at MCSi's headquarters. CW1 has information concerning the Zengine sham transactions (discussed below), improper manipulation of inventory, and the creation of duplicate financial books and records for PwC auditors.

34.     CW2 was an executive in MCSi's Midwest Region from 1999 through early 2004. CW2's responsibilities were supervisory in nature. CW2 has information concerning premature revenue recognition and pre-billing.

35.     CW3 was a field engineer in MCSi's Dallas office/branch from July 2000 to May 2002. CW3's responsibilities included installing multimedia systems for major clients and area schools, as well as repairing and maintaining various types of equipment, including AMX systems, audio systems, video systems, and paging systems. CW3 has information concerning supplier-imposed credit holds and the loss of sales personnel.

36.     CW4 was an account manager in MCSi's Kentucky office/branch from 1985 to May 2003. CW4's responsibilities included generating sales for the Company. CW4 has information concerning premature revenue recognition and pre-billing, supplier-imposed credit holds, and the loss of customers due to MCSi's inability to perform its contracts.

37.     CW5 was an administrative assistant in MCSi's Kentucky office/branch for 10 years, until February 2003. CW5's responsibilities included entering and billing customers' orders and placing equipment orders to suppliers. CW5 has information concerning premature revenue recognition and pre-billing, and supplier-imposed credit holds.

38.     CW6 was an account executive in MCSi's Cincinnati office/branch from September 1998 to September 2001. CW6's responsibilities included computer equipment sales. CW6 has information concerning premature revenue recognition and pre-billing, the cash flow crisis, inflation of revenues on sales, the use of fictitious sales to increase revenues, supplier-imposed credit holds, MCSi's attempts to raise cash, the loss of sales personnel,

11

obsolete inventory, and the failure to properly integrate the financial records of acquired companies onto the JD Edwards System.

39. CW7 had various functions in MCSi's Cleveland office/branch from December 2000 to March 2003, including A/V purchasing, project installation, and project management. CW7 has information concerning premature revenue recognition and pre-billing (to meet Wall Street sales targets), supplier-imposed credit holds, and the manipulation of inventory to justify unsubstantiated sales resulting from pre-billing.

40. CW8 was an engineer in MCSi's Atlanta office/branch from January 2002 to August 2002. CW8's responsibilities included working with MCSi's sales staff in designing, researching, and preparing proposals for integrated technical services. These proposals generally ranged from $100,000 to in excess of $7 million. CW8 has information concerning supplier-imposed credit holds and profit margins.

41. CW9 was an accounting executive in MCSi's Southeast Region from August 2002 to September 2003. CW9 has information concerning supplier-imposed credit holds, loss of customers, overstatement of rental income, inflation of profit margins, obsolete inventory, the failure to establish adequate inventory reserves, and the failure to properly integrate the financial records of acquired companies onto the JD Edwards System.

42. CW10 was an executive in MCSi's Southeast Region from June 2000 to October 2003. CW10 has information concerning the overstatement of rental income, supplier-imposed credit holds, loss of customers, obsolete inventory, the failure to establish adequate inventory reserves, and the failure to properly integrate the financial records of acquired companies onto the JD Edwards System.

43.     CW11 worked in financial reporting in MCSi's corporate headquarters in Ohio from February 2002 to August 2003. CW11's responsibilities included compiling MCSi's regional budgets and forecasts, and preparing MCSi's consolidated monthly and quarterly financial statements. CW11 has information concerning the failure to properly integrate the financial records of acquired companies onto the JD Edwards System, and the manual financial statement consolidation process for unintegrated acquired companies.

44.     CW12 was a manager in MCSi's Portland office/branch from July 1997 to July 2002. CW12's responsibilities included, inter alia, overseeing A/V installation and integration contracts. CW12 has information concerning the failure to properly integrate the financial records of acquired companies onto the JD Edwards System.

45.     CW13 was an account executive from 1985 to July 2002 at the Company's headquarters in Ohio. CW13's responsibilities included selling computers and computer products. CW13 has information concerning the inflation of revenues on sales, inflation of profit margins, supplier-imposed credit holds, and MCSi's attempts to raise cash.

46.     CW14 was a technical sales engineer in MCSi's California Region for approximately one and one-half years, until November 2000. CW14 has information concerning the following pre-Class Period activities: premature revenue recognition and pre-billing, and supplier-imposed credit holds.

47.     CW15 worked in Information Technology ("IT") in MCSi's corporate headquarters in Ohio from April 1992 to October 2001. CW15's responsibilities included working with the JD Edwards System and PeopleSoft, a human resources and payroll web-based system. CW15 has information concerning premature revenue recognition and pre-billing, the

improper manipulation of inventory, obsolete inventory, and the failure to properly integrate the financial records of acquired companies onto the JD Edwards System.

48. CW16 was a sales executive from March 2000 to May 2003 in MCSi's California Region. CW16 has information concerning supplier-imposed credit holds and the Individual Defendants' knowledge thereof, Peppel's management style, and the loss of customers.

49. CW17 was an accounting manager in MCSi's Midwest Region from October 2003 to December 2003. CW17 worked at MCSi after the Class Period, under its post-Class Period leadership, and is able to confirm, through his/her review of MCSi's books and records, the existence of premature revenue recognition and pre-billing during the Class Period.

50. CW18 held various positions in MCSi's corporate headquarters in Ohio for 17 years, until October 2003. CW18's responsibilities included working in purchasing, warehousing, and information technology. CW18 has information concerning the Zengine sham transactions (discussed below).

51. CW19 worked in purchasing in MCSi's corporate headquarters in Ohio from September 1996 through June 2001. CW19's responsibilities included establishing and maintaining relationships with MCSi suppliers, including the top 25 suppliers. CW19 has information concerning supplier-imposed credit holds and the Individual Defendants' knowledge thereof, loss of customers, the Mercatum sham transactions (discussed below), obsolete inventory, and the ClearOne inventory transactions (discussed below).

52. CW20 worked in human resources in MCSi's corporate headquarters in Ohio for five years, until September 2002. CW20's responsibilities included processing payroll, sales

14

commissions, bonuses, and employee benefits. CW20 has information concerning MCSi's acquisition of Mercatum, Ltd. ("Mercatum").

## SUBSTANTIVE ALLEGATIONS

### A.   MCSi's CASH FLOW CRISIS

#### 1.   MCSi's Suppliers Placed the Company on "Credit Hold"

53.     Both before and during the Class Period, MCSi's operations were crippled by poor cash flows, which were caused, in part, by the Company's aggressive acquisition campaign. Between 1995 and 2000, MCSi acquired at least 26 companies. During the period 2000 through 2003, for example, the Company acquired Westek Presentation Systems, Midwest Visual, Intellisys Group Inc., Zengine Inc. ("Zengine"), and Mercatum. The cash flow crisis resulting from these and other acquisitions, as well as from other factors, created enormous financial obstacles to the Company's ability to perform its contracts – contracts heavily dependent upon MCSi's ability to obtain the audio and video equipment to "integrate" for its customers.

54.     Specifically, MCSi's cash flow crisis impacted the Company's ability to pay suppliers. As a result, suppliers placed the Company on "credit hold" and refused to ship product, frustrating the ability of MCSi engineers and technicians to provide quality, timely service to the Company's customers. For example, MCSi's service contract with American Airlines called for it to maintain the AV system used for pilot and flight attendant training. When the projectors in the control room broke down, according to CW3, he/she was unable to order replacement parts. As a result, beginning in May 2002, American Airlines was forced to perform its in-house training through the use of books and manuals only.

15

55.     According to CW6, management instructed MCSi account executives to misrepresent the reasons for the delays in service. "Account executives were instructed to tell customers that orders were late because of UPS delivery mix-ups, or to blame it on our bosses or even ourselves for forgetting to put the order in. You got creative with the lies."

(a)     **Examples of Suppliers Imposing Credit Holds on MCSi**

56.     Supplier-imposed credit holds existed both before and during the Class Period, starting no later than 1999. According to CW14, by 2000 the three largest A/V suppliers in the country, AMX Control System, Extron Electronics, and Sharp Electronics, had placed material restrictions on product shipments to MCSi because of late payments. According to Plaintiffs' confidential witnesses, the credit holds continued in 2000 (CW3, CW10), 2001 (CW3, CW6, CW7, CW13, CW19), 2002 (CW3, CW5, CW7), and 2003 (CW7).

57.     Jennifer A. Bell ("Bell"), a Sales Executive/Branch Manager at MCSi's Cincinnati office, raised widespread concern about credit holds in 2001. In a July 27, 2001 e-mail to John Huffman, Marti Schumann ("Schumann"), Stacey Huntley, Patty Morgan ("Morgan"), and Robert Westrich ("Westrich"), entitled "Credit Holds" (the "July 27, 2001 e-mail"), she wrote: "The situation is getting worse with holds and not better and I have been doing my best to ward off everyone's concerns. They seem to be running out of patience with me." Bell also noted thirteen supplier that had put MCSi on credit hold. Those suppliers, as well as others identified by confidential witnesses, are identified in the chart below:

16

| Supplier | CW 3 | CW 4 | CW 5 | CW 6 | CW 8 | CW 10 | CW 13 | CW 14 | CW 16 | CW 19 | July 27, 2001 e-mail |
|---|---|---|---|---|---|---|---|---|---|---|---|
| All Write Ribbon | | | | | | | | | | | ✓ |
| AMX Control System | ✓ | | | | | | | ✓ | ✓ | | |
| Azerty | | | | | | | | | | | ✓ |
| Chief Manufacturing | | ✓ | | | | | | | | | |
| Crestron Electronics | | | | | | ✓ | | | ✓ | | |
| Daisytek | | | | | | | ✓ | | | | ✓ |
| Digital Storage | | | | | | | | | | | ✓ |
| Electronic Business Machines | | | | | | | | | | | ✓ |
| Extron Electronics | | | | | ✓ | ✓ | | ✓ | | | |
| Fujitsu | | | ✓ | | | | | | | | |
| Gates/Arrow | | | | | | | ✓ | | | | |
| InFocus | | | | | | | ✓ | | | ✓ | |
| Ingram | | | | | | | ✓ | | | | ✓ |
| MICR Source | | | | | | | | | | | ✓ |
| Middle Atlantic Products | | | | | | ✓ | | | | | |
| Mitsubishi | | | | | | | | | | | ✓ |
| NEC | | | | | ✓ | | | | | | |
| Panasonic | | | | | | | | | | ✓ | |
| Ponica | | | | | | | | | | | ✓ |
| Rittenhouse | | | | | | | | | | | ✓ |
| Sharp Electronics | | | ✓ | | | | | ✓ | ✓ | ✓ | |
| Sony | ✓ | | | | | ✓ | | | ✓ | | |
| Techdata | | | | | | | ✓ | | | | ✓ |
| Technical Necessities | | | ✓ | | | | | | | | |
| Tiger Industries | | | | | | | | | | | ✓ |
| United Chair | | | | | | | | | | | ✓ |

58.     CW19 stated that in June 2001 he/she discussed the credit hold situation with Panasonic, Sharp, and Infocus on a weekly basis.

59.     Many suppliers, including many of those identified in the chart above, were owed substantial amounts of money when the Company filed for Chapter 11 protection in June 2003. MCSi's "Consolidated List of Creditors Holding the 30 Largest Unsecured Claims," dated June 2, 2003, includes, inter alia:

| | |
|---|---|
| Sharp Electronics Corporation (the largest unsecured claim) | $1,878,115.26 |
| Hitachi America Limited | $1,694,704.44 |
| NEC Solutions America | $1,373,331.68 |
| Extron Electronics | $637,605.23 |
| Sony Consumer, Sony Corporation of America | $486,377.86 |
| Crestron Electronics, Inc. | $305,697.34 |
| Hitachi Data Systems | $294,317.17 |
| AMX | $234,410.73 |
| Middle Atlantic | $111,901.32 |

### (b)     Supplier-Imposed Credit Holds Caused MCSi to Lose Customers and also Threatened Existing Relationships

60.     Numerous witnesses – including CW4, CW6, CW10, CW14, CW16, and CW19 – stated that credit holds wreaked havoc on MCSi's customer relationships. In many instances, customers terminated their relationship with MCSi as a result of the Company's inability to service their accounts. The problem was particularly acute after September 11, 2001, when, according to CW4, business conditions were especially difficult in the A/V industry, and sales hard to come by.

61.     In early fall, 2001, for example, Palm Beach County, Florida ("Palm Beach")

blacklisted MCSi because of poor service resulting from the credit hold situation. According to

CW10, Palm Beach was a major customer, generating approximately $1.5 million in revenues.

Nonetheless, supplier-imposed credit holds caused MCSi to miss installation and delivery

deadlines. Palm Beach's Procurement/Purchasing Department sent a certified letter to Michael

Lever ("Lever"), MCSi's Florida president, citing MCSi's poor performance as the reason for its

actions. CW10 was shown this letter.

62.     CW6 stated that between approximately April 2001 and September 2001, MCSi

lost the following customers because of delays in product shipments (in this case, computer

supplies):

        a.     Thomson Learning, a subsidiary of Thomson Financial;

        b.     Proctor & Gamble in Cincinnati;

        c.     Keidel Supply;

        d.     Hamilton County, Ohio Sheriff's Department; and

        e.     SDRC.

63.     According to CW6: "The credit hold situation was desperate. What happens if

you've quoted prices on orders to your customers and you can't deliver? You lose your

customers. The order would go on backhold, but the customer would expect it the next day or

the next day after, and when they didn't get it, we would call the supplier about the status and

find out that MCSi was on credit hold."

64.     As CW14 put it: "You simply can not install a system, or provide product to your

customers, when you are on credit hold. There are no spare parts (for the most part) included in a

19

AV integration, so if the credit hold does not get cleared up for weeks you are not going to make your install window. Customers expect good service, and if you don't provide it (many times more than once), poof, you no longer have a customer. When the same problem exists nation wide, a national company can go into a tailspin."

**(c)**    <u>**MCSi Misrepresented Its Cash Flows to Suppliers**</u>

65.    According to CW4, MCSi misrepresented its cash flow to suppliers in order to receive product shipments from them. "A lot of vendors were given false reporting so they would extend credit to the company, and they would go ahead and ship end product and, of course, never receive payment on the product after the company said, 'Oh yeah, we're fine.'"

66.    According to CW3 and CW6, MCSi lost sales people in 2001 as a result of the problems with credit holds and the resulting negative impact on sales commissions.

**(d)**    **Stanley and Peppel Knew of**
<u>**the Supplier-Imposed Credit Holds**</u>

67.    According to CW19, as a result of wide-spread credit holds in mid-2000, CW19 and other MCSi managers from key departments were instructed to jointly prepare a list, on a daily basis, detailing: (1) the names of suppliers who had placed the Company on credit hold; (2) the suppliers that were being paid; and (3) the suppliers that had the most critically needed equipment. This list was compiled into a report that was prepared by the accounting and purchasing departments, and Stanley. The report contained three sheets, showing: (1) back orders of product (in June 2001, according to CW19, MCSi had between $10 million to $12 million in back orders); (2) suppliers that had issued credit holds and the amounts owed (prepared by CW19); and (3) MCSi's cash receipts/available funds (prepared by accounting).

20

Stanley would then determine which suppliers would be paid, even if it meant losing some orders by not paying others.

68.     CW19 stated that Peppel was "always in the loop" and also received the report on a daily basis because MCSi "was at a very critical point." Further, Peppel and Stanley informed CW19 during discussions of the daily reports, "We don't have the cash. We have to wait until we get more money from customers and then we can pay the vendors."

69.     This was confirmed by CW16, who, beginning in 2001, participated in daily telephone calls with Shadan Magdzi ("Magdzi"), a Regional President, Stanley, and Peppel when the cash flow crunches and credit holds became most critical. "They knew about the situation. They knew exactly what was going on." CW16 also described Peppel as a "very hands-on manager."

70.     During these calls, Stanley and Peppel were specifically told which jobs were suffering due to credit holds. Stanley also continued to request and receive daily reports that identified customer accounts/jobs and the products needed for completion. Peppel and Stanley routinely advised CW16 and Magdzi that the entire company was under credit holds. At times, they approved the release of cash for equipment needed on the most urgent jobs.

           **2.      MCSi's Desperate Attempts to Raise Cash**

71.     Both CW6 and CW13 stated that, before September 2001, an Ohio-based bank denied a loan to MCSi that was to be used to pay-down, or pay-off, MCSi's debt to suppliers. CW6 received this information from a regional sales manager. CW13 identified the bank as National City Bank in Cleveland, and stated that the bank refused to approve the loan because of the severity of the Company's credit holds.

21

72.     Desperate for cash to satisfy MCSi's debts to suppliers, or rectify the supplier-imposed credit holds that were choking the Company's ability to serve customers, MCSi sought to raise capital through the equity markets. For example, in August 2001, MCSi offered 4.0 million shares of common stock in a secondary public offering. The Company explained the intended "use of proceeds" in its "Prospectus Supplement (To prospectus dated February 2, 2001)" on Form 424B2 filed with the SEC on August 15, 2001 (the "August 2001 offering"):

> Of the $43.2 million of net proceeds, we expect to use substantially all to repay a portion of our $181 million credit facility and the remainder will be used for general corporate purposes. General corporate purposes include acquisitions, investments, <u>capital expenditures,</u> repurchase of our common stock and other corporate purposes determined, from time to time in the future, by management. [Emphasis added.]

73.     Former employees have stated, however, that the proceeds of the offering were not used for the publicly represented reasons, or to remove the debilitating credit holds. As CW6 explained: "The public offering was done, but it didn't take care of the problem, and we went on credit hold again." According to CW6, Schumann gave the following response when asked why the money was not being used to pay down the debt owed to suppliers: "It's not going for that. They're putting it toward new building furniture." Schumann, who worked in MCSi's headquarters in Dayton, Ohio, and tracked MCSi's credit holds, reported directly to Peppel. According to CW6, MCSi was moving into its new Dayton headquarters during this time frame.

### B.     MCSi FALSELY INFLATED REPORTED REVENUE

74.     MCSi's cash crisis, and the resulting credit holds, made it almost impossible for the Company to perform contracts and generate revenue. To create the illusion of profitability, therefore, MCSi engaged in various improper practices, both before and during the Class Period,

that were designed to falsely, and materially, inflate reported revenue. These practices included the premature recognition of revenue through the creation of pre-bills in the JD Edwards System -- long before an actual invoice was sent to the customer -- and internally increasing prices on invoices after they had been billed to customers. These practices caused both revenues and net income to be materially overstated.

### 1. MCSi Prematurely Recognized Revenues in Violation of GAAP and SAB 101

75. SAB 101, "Revenue Recognition in Financial Statements," is founded on numerous provisions of GAAP. For example, Statement of Financial Accounting Concepts No. 5, "Recognition and Measurement in Financial Statements of Business Enterprises" ("SFAC 5"), ¶ 83(b), issued by the Financial Accounting Standards Boards ("FASB"), states: "revenue should not be recognized until it is realized or realizable and earned." In concert with SFAC 5, SAB 101 states:

> revenue generally is realized or realizable and earned when all of the following criteria are met:
>
> • persuasive evidence of an arrangement exists,
>
> • delivery has occurred or services have been rendered,
>
> • the seller's price to the buyer is fixed or determinable, and
>
> • collectibility is assured.

76. Defendants knowingly, and/or with reckless disregard, violated SAB 101 and GAAP by pre-billing maintenance/service contracts.

23

77.     On July 24, 2002, Stanley and Peppel hosted MCSi's "Q2 2002 Financial Release Conference Call," transcribed by the <u>Fair Disclosure Financial Network</u> (the "Q2 2002 Conference Call"), in which they explained MCSi's general pricing on products and services.

78.     According to Defendants, the average A/V integration project generated approximately $250,000 in revenues, while the average A/V broadcast job generated approximately $3,600 in revenues, and the average order for computer products was $250.

79.     By pre-billing A/V integration projects, in particular, MCSi was able to improperly and materially inflate revenues by approximately one quarter of a million dollars per A/V integration contract.

### (a)     <u>MCSi Pre-billed Maintenance/Service Contracts</u>

80.     Stanley demanded that 100% of revenues generated by maintenance/service contracts, particularly for A/V jobs, be prematurely recognized without creating an accrual account to recognize the revenue over the length of the contract. CW2 stated, "This was Ira's mandate." Other confidential witnesses refer to this process as pre-billing. Significantly, according to CW4, pre-billing occurred primarily at times when financial reporting was occurring, usually at the end of the month, quarter, or year, to enhance reported revenue.

81.     According to CW2, MCSi recognized 100% of the revenues associated with one-year service/maintenance agreements when the equipment installation was completed. Stanley required all maintenance contracts in MCSi's Mid-West region to be accounted for in this way. The region sold approximately $1.5 million worth of service contracts per year.

82.     CW2 stated that the correct accounting procedures required MCSi to reverse the revenue, placing it into an accrual account, and then recognizing the revenue in one-twelfth

increments, as the maintenance agreement progressed from month to month. CW2's explanation is consistent with the requirements of SAB 101 and GAAP. SAB 101 includes the following Interpretive Response to Question 6, in 3. *Delivery and Performance*:

> The Staff believes that, provided all other revenue recognition criteria are met, service revenue should be recognized on a *straight-line basis* . . . over the contractual term of the arrangement or the expected period during which those services will be performed, which ever is *longer*. [Emphasis added.]

83.     Before February 2001, according to CW2, the Mid-West region accounted for service revenue over the life of the service contract in accordance with GAAP and SAB 101. That month, when the branch was integrated into the JD Edwards System, Stanley mandated that all of the Mid-West's accruals (i.e., deferred revenue) be improperly accelerated and recognized in the month of February 2001. CW2 stated that there was no reason why the proper accounting methodology, previously used by MCSi's Mid-West region, could not have been transferred onto the JD Edwards System.

84.     CW17 confirms that, under the Individual Defendants' management, MCSi was improperly recording revenue on its one-year service contracts. According to CW17, such contracts were generally billed and revenues were recognized in full at the commencement of the job, in violation of GAAP.

(b)     **MCSi Pre-billed A/V Contracts**

85.     CW5 stated that, in July 2002, shortly after MCSi had spun off its computer products division, MCSi began to "pre-bill" A/V contracts in the JD Edwards System. The practice remained in effect in February 2003. The directive came from an MCSi supervisor, John Melvin ("Melvin"). Melvin reported to Fred Lamm ("Lamm"), an MCSi district manager based

25

in Nashville. Lamm reported to John Huffman ("Huffman"), MCSi's then Chief Operating Officer ("COO"), based in the Company's headquarters in Dayton, Ohio.

86.     According to CW5, before July 2002, when a purchase order was received from a customer, product was ordered and a "job" was created. The client was subsequently billed when the job was completed. However, after July 2002, pre-billing (i.e., generating invoices and recognizing revenue immediately upon receipt of a purchase order) increased. The Company's quarterly financial statements reveal the impact of this improper practice. MCSi's Form 10-Q for the quarter ended June 30, 2002 (the "2Q 2002 10-Q"), filed with the SEC on August 14, 2002, reported $123.5 million in net sales. The Form 10-Q for the quarter ended September 30, 2002 (the "3Q 2002 10-Q"), filed with the SEC on November 14, 2002, reported net sales of $137.5 million, representing a $13.9 million, or 11.3%, increase in quarter over quarter net sales.

87.     According to CW4, pre-billing entailed "generating an invoice to show that revenue did book during a certain month even though the job may not have been officially started, before the customer received equipment, or before their product had been installed if it was an integration." CW4 further stated that Melvin directed his staff to pre-bill certain jobs in the JD Edwards System at 100% of the contract's value to create the appearance of achieving monthly sales quotas/goals. This caused the system to create corresponding accounts receivables for the prematurely recorded revenues, materially overstating current assets as well.

88.     Defendants' practice of pre-billing, described by CW4 in ¶ 87, above, violated SAB 101's delivery requirement for revenue recognition. SAB 101 defines delivery in the Staff's Interpretive Response to Question 3, in *3. Delivery and Performance*:

26

Delivery generally is not considered to have occurred _unless_ the product has been delivered to the customer's place of business or another site specified by the customer.

\* \* \*

A seller should substantially complete or fulfill the terms specified in the arrangement in order for delivery or performance to have occurred. When applying the substantially complete notion, the staff believes that _only inconsequential_ or _perfunctory_ actions may remain incomplete such that the failure to complete the actions would not result in the customer receiving a refund or rejecting the delivered products or services performed to date.

\* \* \*

If an arrangement requires the delivery or performance of multiple deliverables, or "elements," the delivery of an individual element is considered _not_ to have occurred if there are undelivered elements that are essential to the functionality of the delivered element because the customer does not have the full use of the delivered element. [Emphasis added.]

89.     CW5 confirmed that Melvin mandated pre-billing purchase orders for 100% of

the contract's value, stating: "They knew good and well they didn't have that job scheduled until

the middle of January, but they would go ahead and bill it at December 31st. It would make

year-end numbers look better." CW4 also stated, "Being a sales organization, there was always

a push to get as much billed as possible. From the company's standpoint, they needed to show

good numbers each quarter, each month. That had always been the case with MCSi."

90.     Invoices were not mailed until the job was completed, creating large gaps (e.g.,

one month, or more) between the invoice (and revenue recognition) date and when it was actually

mailed to the customer for payment. This practice violated all three examples of SAB 101's

delivery requirement for revenue recognition, discussed at ¶ 88, above.

27

91.     Additionally, if a job generating substantial revenue was close to completion, MCSi would bill it in the JD Edwards System to create the revenue stream, but retain the invoice until the job had been completed. Both CW4 and CW5 stated that, in some instances, a manual invoice was created and sent to the customer because the computerized version (i.e., the pre-bill) had such a premature bill date (i.e., the date it was actually pre-billed versus the job's true completion date). This practice violated SAB 101's "substantially complete" delivery criteria for revenue recognition (see ¶ 88, above) because, had there been only "inconsequential or perfunctory actions" remaining to be performed, there would have been no material date discrepancies between the pre-bill date and actual job completion date.

92.     Pre-billing, in addition to falsely inflating revenues and accounts receivable, also caused a negative by-product: the elongation of customer payment cycles recorded in the JD Edwards System. This by-product negatively impacted reported days sales outstanding ("DSO"), causing it to increase, relative to the high revenues reported in MCSi's financial statements. The DSO metric represents the average time it takes to collect a receivable following a credit sale during a specified period. In other words, the DSO metric indicates how long, on average, it takes for a company to turn its accounts receivable into cash.

93.     In the MCSi/Lender Complaint, the Company confirms that "Stanley's creative journal entries resulted in a large overstatement of MCSi's accounts receivable and income for 2002." However, as alleged in ¶¶ 225-226, 243-244, and 264-265, below, MCSi made several false and misleading statements during the Class Period concerning the reasons for the increase in its DSO, in an attempt to hide the true cause of the increase.

94.     The University of Kentucky, Northern Kentucky University, and Sullivan University are examples of clients whose A/V installation contracts were improperly pre-billed by MCSi, resulting in premature revenue recognition, before the projects/jobs were completed and before actual invoices were sent to the clients. According to CW4, these customers did not pay MCSi, nor were they invoiced any portion or percentage of the installation services, until the jobs were completed in full. CW4 further stated that, throughout his/her employment, contracts with all academic clients serviced out of MCSi's Louisville office did not require full, or even partial, pre-payment. Payment was required only when installation was completed.

95.     According to CW4, MCSi's contracts with corporate customers, such as Electronic Data Systems (EDS), J.C. Penney, Nortel, and Texas Instruments, required a 30% retainer at the commencement of a job, which was recognized as revenue upon receipt. Under SAB 101, recognition of the 30% deposit as revenue is improper. Indeed, SAB 101 states the following in the Staff's Interpretive Response to Question 4, in *3. Delivery and Performance*:

> Because Company R retains the risks of ownership of the merchandise, receives only a deposit from the customer, and does not have an enforceable right to the remainder of the purchase price, the staff would object to Company R recognizing any revenue upon receipt of the cash deposit. [Emphasis added.]

96.     Specific examples of pre-billing include the following.

### (i)     **University Of Kentucky**

97.     According to CW4, MCSi performed numerous installation jobs for the University of Kentucky, each of which generally ranged in price between $10,000 and $20,000. These were usually A/V installations of projectors, plasma screens, and sound systems within classrooms.

29

98.     CW5 stated that, in October 2002, MCSi's Louisville office was under contract with the University of Kentucky, in Lexington, for three separate A/V installation jobs, two of which had not yet started, while the other was underway. That same month, Melvin demanded that CW5 pre-bill the University of Kentucky for all three jobs. According to CW5, the University of Kentucky was not sent an actual invoice until 60 days later on at least one of the three jobs, because the installation was not actually finished until then.

99.     This was a violation of SAB 101's "substantially complete" and "essential to functionality" delivery requirements for revenue recognition. See ¶ 88, above.

### (ii)     Northern Kentucky University

100.     According to CW4, around August or September of 2002, MCSi's Louisville office received a purchase order valued at approximately $100,000 from Northern Kentucky University, in Highland Heights, Kentucky, for A/V installation work. The A/V installation work included the installation of projectors, sound systems, and Creston control systems used to operate a room environment (e.g., turning on a projector, and raising and lowering volume, etc.). Several weeks before the job was completed and officially billed to Northern Kentucky University, all of the revenue was booked within the JD Edwards System. According to CW4, this was done to "meet monthly numbers."

101.     This violated SAB 101's "substantially complete" and "essential to functionality" delivery requirements for revenue recognition. See ¶ 88, above.

### (iii)     Sullivan College

102.     CW4 stated that, at the end of May 2002, MCSi's Louisville office received a $60,000 purchase order from Sullivan College in Lexington, Kentucky, for A/V installation

services. The job required MCSi to install projectors, plasma screens, and broadcast equipment in various classrooms. This job was completed, and an invoice mailed, in October 2002. According to CW4, however, MCSi pre-billed the job and prematurely recorded 100% of the revenue in September 2002, because the office was not meeting its revenue goals for that month.

103. This violated SAB 101's "substantially complete" and "essential to functionality" delivery requirements for revenue recognition. See ¶ 88, above.

### (c) MCSi Improperly Pre-billed Clients for Equipment Orders

104. CW6 stated that MCSi booked 100% of the revenue on equipment orders from customers before the product was shipped in full and before the customer was billed for the order. According to CW6, if, for example, a customer ordered 30 printers and only 15 were available from the supplier at that time, MCSi would generate an invoice for all 30 printers (i.e., 100% of the order), record the revenue from the entire order, and retain the invoice. The Company mailed the invoice only when the entire order was shipped. This practice allowed the Company to materially inflate both reported revenues and net income.

105. The above practice violated SAB 101's "delivery to customer's place of business" and "substantially complete" requirements for revenue recognition. See ¶ 88, above.

### 2. MCSi Inflated Revenues Generated From Customer Sales

106. In June 2002, before the close of the second quarter, Stanley told Terina Jones ("Jones"), a special projects manager, to change the price of merchandise sold to Retrobox, an MCSi customer. According to CW6, the invoice for 7,000 Dell computers, each priced at $300, had already been billed and mailed to Retrobox. Stanley ordered that the price on the invoice (which was stored in the JD Edwards System) be increased to $900. The $600 fictitious price

increase resulted in a $4.2 million material inflation of revenues for the quarter ended June 30, 2002. CW6 further stated that the increased $900 price did not reflect the market value of the Dell computers, which were stripped down, bottom-of-the-line models, without CD-ROM drives. These computers were initially intended to be sold to FedEx, but the deal fell through. Retrobox bought them at a reduced price to upgrade them.

107. CW13 confirmed this practice, stating that MCSi's senior managers, including the Individual Defendants, had data entry people change the invoiced price of products to create the appearance of higher sales.

108. Further, MCSi admits in the MCSi/Lender Complaint that in March 2002, several months before Stanley's June 2002 directive to Jones, Stanley also fabricated journal entry 56381, entitled "Retrobox to CTG." According to the MCSi/Lender Complaint, this was one of five journal entries Stanley fabricated to accounts receivable, "totaling over $18 million." According to the MCSi/Lender Complaint, the other fabricated journal entries were: (1) Entry 56378, entitled "Correct date of sales"; (2) Entry 56379, for "Major Projects"; (3) Entry 56380, for "Major Projects #2"; and (4) Entry 56381, entitled "Reclass of major proj."

## C.   MCSi OVERSTATED RENTAL INCOME

109. MCSi also rented equipment (e.g., projectors) to customers. According to CW9, MCSi violated GAAP and inflated rental income by failing to record periodic depreciation expense for rental inventory. CW9 stated that rental inventory/equipment was overvalued for the year ended December 31, 2002.

110. Wiley GAAP 2003, by Delaney, Epstein, Nach and Weiss ("Wiley GAAP"), defines depreciation as follows:

**Depreciation.** The <u>periodic charge to income</u> that results from a systematic and rational <u>allocation of cost over the life</u> of a tangible asset. [Emphasis added.]

111. Wiley GAAP further states:

**Depreciation of fixed assets.** <u>The costs of fixed assets are allocated to the periods they benefit through depreciation. The method of depreciation chosen must result in a systematic and rational allocation of the cost of the asset</u> (less its residual or salvage value) <u>over the asset's expected useful life.</u> The determination of useful life must take a number of factors into consideration, including <u>technological change</u>, normal deterioration, and <u>actual physical usage</u>. The method of depreciation is determined as a function of time (*e.g.*, <u>technological change</u> or normal deterioration) or as a function of <u>actual physical usage</u>. [Emphasis added.]

112. MCSi intentionally and/or recklessly failed to depreciate rental assets, which were subject to both technological change and actual physical usage, in addition to normal deterioration. For example, MCSi would buy a projector for $5,000 and continue to carry it on the books as a $5,000 asset, whereas one year after purchase, according to CW9, "I'm lucky if that thing is worth $200." CW9 stated that MCSi failed to adjust its rental income for depreciation expense. MCSi carried the equipment on the balance sheet at full cost, and the P&L (i.e., profit and loss) did not reflect the economic detriment (i.e., the loss of the value of the rental asset) over time. CW9 stated that this practice was occurring when he/she joined the Company in August 2002.

113. CW9 reported the overvaluation of rental inventory (e.g., projectors, video screens, etc.) in writing to several finance executives in January or February 2003, indicating that both the balance sheet and P&L statement for 2002 were overstated. The report emphasized that approximately $800,000 of the $3 million inventory value was impaired. CW9 further stated,

33

"All together, there was $6 million between accounts receivable and inventory, and I told them they had a $1.1 million impairment and that they needed to cover those things with reserves." The finance executives to whom CW9 sent his/her report included Daniel Knotts ("Knotts"), MCSi's then COO, and Ahrns, Corporate Controller. Knotts reported directly to Stanley. Ahrns is a named defendant in the MCSi/Lender Complaint. CW9 characterized the response to his/her report as hostile, and said that one of the recipients, Knotts, called him to ask, "Who's seen this?"

### D. MCSi UNDERSTATED OPERATIONAL EXPENSES TO FALSELY INFLATE PROFIT MARGINS

114. CW13 was informed by Mary Stewart ("Stewart"), who reported directly to Peppel and Stanley and was, at one time, MCSi's CFO, that Peppel and Stanley directed her not to record certain operational expenses on A/V installation contracts, including costs associated with engineers and installers assigned to the job.

115. CW13 stated that MCSi falsely reported, on its website, that the Company was obtaining a 30% profit margin on A/V contracts. According to CW9, MCSi, under Peppel, inflated profit margins on A/V broadcast and installation contracts. MCSi's consolidated financial statements were reporting profits of 38%, while CW9's branch consistently recorded profit margins of around 22%. CW8 also stated that normal profit margins on A/V contracts ranged from 23%–28%.

116. This practice caused both profit margins and net income to be materially overstated.

### E.  MCSi CREATED FICTITIOUS SALES TO INFLATE REVENUES

117.  MCSi admitted in the MCSi/Lender Complaint that, between August 2001 and December 2001, it had generated approximately $41.137 million in fictitious revenues from sham transactions.  This caused the revenue and net income reported in the Form 10-Q for the quarter ended September 30, 2001 (the "3Q 2001 10-Q") and the Form 10-K for the year ended December 31, 2001 (the "2001 10-K") to be materially overstated.

#### 1.  The Zengine Sham Transactions

118.  In the MCSi/Lender Complaint, MCSi admitted that, on August 31, 2001, before its acquisition of Zengine in November 2001, MCSi and the Individual Defendants "sold" approximately $4.037 million in inventory (i.e., overhead projectors and "gyro mouse" presentation pointers) to Zengine for which Zengine, a website developer, had no "business use." The sale also included "several hundred thousand dollars worth" of inventory from ClearOne Communications Inc. ("ClearOne") (i.e., Gentner brand audio visual and teleconferencing equipment), which the Company had previously "purchased" from ClearOne.  According to the MCSi/Lender Complaint, the inventory "never left MCSi's main warehouse in Erlanger, Kentucky, and consistent with this pattern, Zengine never paid for the Inventory [described above]."  This transaction caused revenues and income reported in MCSi's 3Q 2001 10-Q to be materially overstated.

119.  In October 2001, soon after this "sale," MCSi announced its plans to acquire Zengine.  According to a press release filed on Form 8-K with the SEC on October 5, 2001, MCSi owned approximately 58.5% of Zengine's outstanding shares.

35

120.    CW6 stated that Zengine never really had a legitimate business, once it was owned by the Company. Zengine was supposed to engage in website creation for customers, but that never materialized and, according to CW6, "management would never give us the straight answer as to what Zengine really did." Instead, "Zengine had an office and basically paperwork, but nothing really came out of Zengine."

121.    According to CW18, there was talk among MCSi employees "that the two companies were doing a lot of transactions with one another to make the money look good," and that these "were not real transactions." CW18 stated that "there was a lot of adjusting on the books back and forth to make the numbers look good where they needed to." This was confirmed by CW1, who handled the internal programming for Zengine's integration onto the JD Edwards System after its acquisition by MCSi. CW1 confirmed that Zengine was not generating an order volume, stating, "It was like it was just a big scam. It seemed like a lot of smoke and mirrors to me to begin with."

### 2.    The Mercatum Sham Transactions

122.    The fate of the $4.037 million inventory sham sale to Zengine did not end with that transaction. In early June 2001, while at an "Infocom 2001" trade show in Las Vegas, Peppel introduced CW19 to David White ("White"), President of Mercatum. During this time, CW19 became aware that Peppel and White "were putting some deal together" relating to the U.K. CW19's employment with MCSi ended shortly thereafter.

123.    MCSi admitted, in the MCSi/Lender Complaint, that, on December 4, 2001, the Company generated three invoices recording a total sale of $37.1 million in "surplus inventory" to Mercatum. According to shipping documents, this was the $4.037 million Zengine inventory

previously billed to Zengine and recorded as revenue in August 2001. This sale purportedly represented MCSi's satisfaction of three July 2001 purchase orders from Mercatum, totaling $37.1 million. Two of the purchase orders required "Misc A/v [sic] products," and one required "A/V Accessories."

124. In a December 11, 2001 letter, approximately five months after the Mercatum purchase orders were issued, and one week after they had been billed, Mercatum instructed MCSi to "'hold and store our product' until 'arrangements with our freight people' were confirmed." The inventory was stored at MCSi's Erlanger, Kentucky warehouse. MCSi further admitted that, along with Mercatum, it falsely certified that the transaction was a "bill and hold" sale, in a letter dated February 22, 2002 to MCSi's accountants. This was not, however, a valid bill and hold arrangement under SAB 101 for the following reasons: (1) a "fixed schedule for delivery of the goods" did not exist; and (2) the "risks of ownership" did not pass to Mercatum because (i) as alleged below, the inventory was never shipped to Mercatum, and (ii) Mercatum's President, White, informed MCSi that Mercatum would not insure the inventory, and that shipment was at MCSi's risk.

125. In June 2002, in response to CW20's inquiry concerning Mercatum, Stanley stated that MCSi was in the process of acquiring Mercatum in the U.K. CW20 then inquired of Stanley what was needed to be done to move Mercatum's employees onto MCSi's payroll, a routine practice for MCSi's acquisitions. Stanley informed CW20 that Mercatum's staff would not be included on MCSi's payroll. According to CW20, Stanley further stated, "We're dealing with some products there. They have a warehouse. They're going to house products for us. We're not

37

really going to worry about sales people and commission structures and all that. . . . It's a whole different situation than you are normally used to."

126.    MCSi acquired Mercatum on June 28, 2002. The Company described Mercatum as a "distributor of audio visual equipment located in Leeds, England," in its Form 8-K filed with the SEC on July 15, 2002.

127.    MCSi further admitted that, eight months after the Mercatum "purchase," the inventory was not shipped to Mercatum in England, but instead addressed to a post office box in Dubai, United Arab Emirates. A November 6, 2002 letter from Rao to the United States Customs Service confirms that the Zengine inventory was sent to MCSi's Dubai office. In June 2002, MCSi acquired Mercatum.

128.    The MCSi/Lender Complaint states that, on September 13, 2002, Lori Clifford ("Clifford"), who had responsibility over inventory control at the Company's headquarters (according to CW1), sent an e-mail to Walther entitled "Mercatum sale (Zengine)." The e-mail attached a list of the Zengine inventory sold to Mercatum and improperly booked as revenue in December 2001 (the "September 13, 2002 e-mail"). Clifford wrote, "Highlighted amounts relate to goods sold to Mercatum in Feb/March time frame (sale booked in December 2001)." Clifford's September 13, 2002 e-mail also stated, "Invtry will be removed with adjustment (soon)."

129.    MCSi further admitted, in the MCSi/Lender Complaint, that on December 18, 2002, White documented a sale of the MCSi inventory to SAPP, a Dubai company, for $24.5 million. The owner of SAPP, Clive Fernandez ("Fernandez") was both a shareholder of Mercatum and an employee of MCSi. On March 17, 2003, SAPP wrote a letter to White

confirming that the "whole lot" of inventory purchased by SAPP was being returned to the United States. An invoice, valuing the inventory at approximately $12 million, showed that it was shipped to Rao's attention at MCSi. The inventory was eventually stored at the Erlanger, Kentucky warehouse.

### F.  MCSi's INVENTORY VALUE WAS MATERIALLY MISSTATED

#### 1.  MCSi Improperly Manipulated Inventory

130.  CW1 stated that MCSi was "purposely manipulating numbers to make things come out the way they wanted." According to CW1, Clifford, at Stanley's direction, demanded that inventory numbers at particular warehouse locations be altered within the JD Edwards System. Clifford prefaced her directives to CW1 with, "Ira wants this. . . ," and "Whatever Ira wants. . . ." CW1 stated, "inventory levels were altered before the numbers were being reported [to outside accountants]. They were wiped out of the system. The total net effect of all this was to reduce MCSi's currently-reported inventory." CW1 also stated, "The numbers that they evidently reported [to outside auditors] were not the true numbers." The Company admitted Clifford's involvement in other inventory manipulation schemes in the MCSi/Lender Complaint, as alleged in ¶ 128, above.

131.  According to CW1, the JD Edwards System maintained information about inventory in "tables," which listed each item, the inventory quantity, and the warehouse location where the inventory was being stored. Each item was assigned a particular dollar value in the system. The system rolled up the inventory data into the general ledger in the form of dollars, representing the inventory value reported in the Company's financial statements. According to

CW1, "In terms of reporting, the JD Edwards System was the Bible." At December 31, 2001, MCSi operated the following twelve warehouse facilities across the country:

| Bensenville, Illinois | Cypress, California | Farmers Branch, Texas | Norcross, Georgia |
|---|---|---|---|
| Berkeley, California | Dayton, Ohio | Memphis, Tennessee | Redmond, Washington |
| Brookfield, Wisconsin | Erlanger, Kentucky | New Berlin, Wisconsin | Strongsville, Ohio |

132.    CW1 explained how the inventory numbers were altered upon Stanley's request: "You go into the program and you add a zero back in, and it would be just like clearing it." Anyone in the IT Department had the capability to perform manual overrides to the inventory in the JD Edwards System.

133.    Further, CW15 stated that, beginning in January 2001, he/she observed Stanley directing Dale Phillips ("Phillips"), Director of Information Systems (with oversight for the JD Edwards), to manipulate numbers in the JD Edwards System. These requests usually coincided with audits conducted by PwC. CW15 overheard Stanley say to Phillips, "How do we get the numbers to look like this?" In other instances, CW15 observed Stanley showing Phillips something on paper and saying, "This is the number we have to come up with," or "This has to be the bottom-line number," or "We need to change this up here and this down there." These exchanges occurred numerous times. CW15 also confirmed that PwC was not shown "live" JD Edwards System data, only spreadsheets.

### (a)    MCSi Wiped Out Inventory on the JD Edwards System to Justify Unsubstantiated Sales Caused by Pre-billing

134.    Defendants had to manipulate MCSi's inventory values, as alleged in ¶¶ 130-133, to validate the appearance of the increased revenues Defendants prematurely and improperly

created through their improper revenue recognition practices, (i.e., pre-billing, alleged in ¶¶ 74-104, above).

135. For example, according to CW7, during the fall of 2001, before MCSi's secondary offering in December 2001, Michael Trebilcock ("Trebilcock"), an MCSi Vice President and Chief Development Officer, directed an employee in the Cleveland office to clear out all of the inventory on its books for a pending $1 million A/V installation job for Case Western Reserve University ("Case Western"). CW7 stated, "Even though they hadn't billed the customer, and the customer hadn't paid, they were still clearing out completely all of the inventory in the system to show that it was actually on site. They basically were billing out products that were still in the warehouse."

136. This was done to give the impression that the job had been completed and revenues earned when, in reality, the Case Western job was experiencing significant delays. According to CW7, inventory "is reflected in the [JD Edwards] system as a sale once they 'close' it out."

137. According to CW7, inventory sold through MCSi's Cleveland office was stored in its Strongsville, Ohio warehouse. Inventory was organized on shelves according to job. "You could literally go back to the Strongsville warehouse and see the products on the shelf, and yet they were billed out of the system." As CW7 stated, "they just pushed a button, closed it out of the system, and billed it. It wasn't elaborate."

138. Approximately $500,000 of various A/V products (i.e., switches, projectors, screens, and other A/V equipment components) were improperly and prematurely billed. CW7 stated that the Case Western job was completed one year late.

139.   This practice violated SAB 101's revenue delivery and performance recognition criteria, particularly Interpretive Response to Question 3, in *3. Delivery and Performance*:

> The staff believes that delivery generally is not considered to have occurred unless <u>the customer has taken title and assumed the risks and rewards of ownership</u> of the products specified in the customer's purchase order or sales agreement. <u>Typically this occurs when a product is delivered to the customer's delivery site</u> (if the terms of the sale are "FOB destination") <u>or when a product is shipped to the customer</u> (*if* the terms are "FOB shipping point"). [Emphasis added.]

140.   Because these products remained on the shelves and had not been shipped on at least "FOB shipping point" terms, the risks and rewards of ownership had not passed to the customer and revenue recognition was improper.

141.   CW7 stated that MCSi's management selected large revenue jobs, like the Case Western job, to pre-bill in the JD Edwards System.

## 2.   MCSi Maintained Material Amounts of Obsolete Inventory

142.   Several confidential witnesses state that MCSi maintained material amounts of obsolete inventory during the Class Period.  Further, MCSi admitted in the MCSi/Lender Complaint that the Company stored "slow-moving ClearOne inventory in MCSi's warehouse for long periods of time."  The Company also overstated its inventory value, and net income, by failing to record adequate reserves, as alleged in ¶¶ 152-153, below.

### (a)   Several Confidential Witnesses Observed Material Amounts of Obsolete Inventory

143.   According to CW6, MCSi purchased significant quantities of projectors that quickly became obsolete because manufacturers created newer products approximately every four months.  The Company failed to write off obsolete inventory that it maintained on its books

42

as having value, causing periodic net income to be materially overstated. According to CW9, MCSi maintained "a lot of obsolete, damaged inventory" in the Southeast Region, where he/she worked.

144.    CW10 stated that MCSi acquired a lot of worthless inventory from the companies it acquired, including Central Audio. CW15 confirmed that MCSi purchased "millions of dollars of junk" when it acquired companies such as Intellisys Group, Inc. ("Intellisys"). Intellisys had a significant amount of obsolete A/V equipment that was five and six years old, which CW15 observed when he/she visited Intellisys branches to set up e-mail and network systems after MCSi's acquisition.

145.    Other acquisitions with obsolete inventory observed by CW15 were Imperial Data Supply Corporation ("IDS"), located in Spokane, Washington, and Minnesota Western, located in California. IDS was a computer supply dealer and Minnesota Western was an A/V integrator. According to CW15, inventory was marked with colored-coded dots representing the year(s) A/V equipment was counted as inventory. In many instances, boxes had eight different dots, signifying that they had been held in stock for at least eight years.

146.    CW15 further stated that, before it was sold in July 2002, MCSi's computer products division maintained "a lot of old stuff they could never sell." This included "print heads" for printers that had not been manufactured for at least 10 years. Yet MCSi maintained these parts in inventory as having value.

147.    CW19 stated that inventory wasn't moving due to a slowdown in customer jobs and excess inventory resulting from MCSi's acquisitions. For example, with the CMS acquisition, MCSi acquired approximately $2 to 3 million worth of slow-moving or dead

inventory. According to CW19, by June 30, 2001, MCSi had approximately $43 to 45 million worth of inventory in stored in its Erlanger, Kentucky warehouse, approximately one half of which the Company was trying to return because it could not be sold.

### (b) The ClearOne Connection

148. In the MCSi/Lender Complaint, the Company admitted that certain "quid pro quo" transactions with ClearOne contributed to the Company having to maintain "slow-moving" inventory for "long periods of time." According to the MCSi/Lender Complaint, Peppel and Francis Flood ("Flood"), ClearOne's Chairman, President, and CEO, agreed that MCSi would purchase ClearOne product at inflated prices to inflate ClearOne's revenues, and then record those purchases at regular prices on MCSi's books, with payment to be made only when the merchandise was actually sold by MCSi. MCSi admitted that the value of this slow-moving, excess ClearOne inventory, reported in its financial statements, was "as much as $2.5 million."

149. CW19 stated that, in the first quarter of 2001, Flood visited Peppel. Shortly thereafter, Matthew Curtis ("Curtis"), an MCSi buyer, issued a purchase order to ClearOne for over $1 million of conference telephones and telephone communication devices. According to CW19, MCSi policy was that every order over $500,000 had to be approved and signed by either Peppel or Stanley. CW19 further stated that, up to this point, MCSi usually purchased approximately $50,000 in product from ClearOne every month.

150. CW19 confronted Peppel about the "totally out of the ordinary" order, indicating that it was "not a good buy," and that MCSi did not have the "sales history" to move the volume of product ordered from ClearOne. The products were eventually stored at the Erlanger, Kentucky warehouse, but sales were slow. CW19 attempted to return some of the excess

44

inventory to ClearOne, but ClearOne refused to accept the returns. When CW19 informed Peppel of ClearOne's refusal, Peppel said, "Well, keep trying to return it."

151.    In June 2001, when CW19 left MCSi, the ClearOne inventory was still in the Erlanger, Kentucky warehouse.

### (c)    MCSi Failed to Record Adequate Inventory Reserves

152.    CW9 stated that many accounting executives in MCSi's offices/branches were sending reports to corporate headquarters, stating that inventory was overstated and that recorded reserves were insufficient. It was policy at MCSi that regional accounting executives did not have the authority to make necessary regional adjustments (i.e., write-offs and other adjustments to inventory and accounts receivable). All adjustments were made at the corporate level.

153.    This was confirmed by CW10, who learned from Lever, MCSi's Florida president, that Lever repeatedly informed Stanley between October 2000 and October 2003 that inventory reserves needed to be established. Stanley ignored this advice.

### 3.    MCSi Auctioned Off Obsolete Inventory After the Class Period

154.    In the MCSi/Lender Complaint, MCSi admitted that, in a November 6, 2002 letter to the United States Customs Service, it stated that the Zengine inventory, sold to Mercatum and shipped to MCSi's Dubai office, consisted of "slow moving products" that were being returned.

155.    MCSi further admitted that the returned products were eventually auctioned off for approximately $4 million, after the Company filed for bankruptcy in June 2003.

156.    CW10 confirmed that, in August or September 2003, MCSi's corporate headquarters requested that he/she prepare a list of unneeded, excess, and obsolete inventory for purposes of auction. According to CW10, the on-line auction, which was conducted in Erlanger,

Kentucky, MCSi's main distribution center, occurred shortly after his/her employment with MCSi ended, in October 2003, and included obsolete inventory gathered from all of MCSi's offices throughout the country.

### G.   MCSi CREATED SANITIZED BOOKS AND RECORDS FOR PwC AUDITORS

157.   In the MCSi/Lender Complaint, MCSi admitted that Stanley maintained a "secret inventory list," which tracked the differences between the Company's inventory and its general ledger. Those differences resulted from Stanley's improper manipulations of both accounts receivable and inventory. MCSi also admitted that, on February 14, 2003, Ahrns sent Harold Lloyd ("Lloyd"), a programmer in MCSi's IT Department, an e-mail with a reconciled inventory list, edited by Stanley and Ahrns. Although this list matched the general ledger, it was sent "for the sole purpose of creating a paper trail of the contrived inventory list."

158.   This practice also occurred during CW1's tenure at the Company. CW1 learned of Stanley's mandates to MCSi programmers to create different books and records – one for internal records and one for the specific use of PwC auditors – from Lloyd, who was tasked with creating the separate data set pursuant to Stanley's directives.

159.   CW1 stated that, to maintain two sets of books, MCSi's IT staff created separate financial records that mimicked the actual JD Edwards System. CW1 further stated that the second set of records was "dependent upon what data the auditors were asking to see." CW1 stated that this included data relating to, inter alia, inventory, accounts receivable, and accounts payable. The auditors based their report(s) on this second, false set of financial records.

160.    CW1 also stated that PwC auditors would see only the false, second set of financial records when they signed onto MCSi's internal program, using their MCSi user-IDs. "They were, unknowingly, looking at a data set which was no longer live." CW1 further stated that, leading up to mid-2002, the last year he/she was at MCSi, PwC auditors were "constantly" on the premises.

**H.    MCSi's INTERNAL CONTROLS WERE MATERIALLY WEAK**

161.    MCSi's internal controls were materially weak beginning no later than 2001.

**1.    As result of PwC's 2001 Audit, MCSi's Audit Committee Knew of, and Failed to Remedy, Internal Control Weaknesses**

162.    On June 25, 2003, Defendants filed a Form 8-K with the SEC, dated June 19, 2003 (the "June 19, 2003 Form 8-K). The June 19, 2003 Form 8-K discussed a letter from PwC to the Company's board of directors, received that same day, informing them of an "apparent override of the control systems by Company's former senior management." In addition, PwC revealed that, in connection with its 2001 audit, it had reported to the Company's then-audit committee a "reportable condition concerning internal control and its operation." According to PwC (as revealed in the June 19, 2003 Form 8-K), however, "the lack of attention of prior management to this reportable condition had elevated it to a material weakness." PwC also stated that it was not in a position to know whether the Company's post-Class Period management had remedied these material weaknesses.

**2.    MCSi Failed to Properly Integrate All Its Subsidiaries onto the JD Edwards System**

163.    According to CW15, the JD Edwards System was acquired in January 1999 and installed in MCSi's Dayton, Ohio headquarters. Between January 1999 and January 2001, the